THE PEOPLE v. KENT.

APPEAL from a decision of the District Court of San Juan.

No. 46.—Decided March 5, 1906.

INFORMATION—PLEA OF DEFENDANT—WITHDRAWAL OF PLEA—DISCRETION OF COURT.—It is within the discretion of a trial court to permit a defendant to withdraw his plea of "not guilty" and file a demurrer to the information.

CONSTRUCTION OF STATUTES TAKEN FROM OTHER STATES.—It is a well established principle of construction that when the legislature of one State adopts a statute from another State it is presumed that it accepts the construction which the courts of the latter State have put upon it.

INFORMATION—REQUISITES NECESSARY SO THAT IT BE SUFFICIENT.—An information is ordinarily sufficient if it contains the requisites set forth in sections 71, 72 and 73 of the Code of Criminal Procedure.

ID.—EMBEZZLEMENT.—In the information filed in this case it is stated that the accused "was entrusted with the duty of keeping the accounts and books of the said office, authorizing him to collect the money due the treasury of the said club and he was charged with the duty of delivering it to the treasurer * * * ;" and "that on or about the date mentioned, the said accused * * * illegally and fraudulently withdrew and applied to his own use the sum of * * * which money belonged to the club and had been collected by the accused by virtue of the authority which had been conferred upon him." It was decided that that information was sufficient to charge the accused with the crime of embezzlement.

ID.—DISTINCTION BETWEEN EMBEZZLEMENT AND LARCENY.—The distinction between the crimes of embezzlement and larceny consists in that in the former the accused is legally in possession of the property, while in the latter he takes it from the possession of another. In both cases it is illegally appropriated.

ID.—So that the crime of embezzlement may be understood as having been committed, it is not necessary that the money alleged to have been appropriated, should have been entrusted to the accused directly by the owner thereof, the only requisite being that he have it in his custody and it is of no importance what persons entrusted it to him.

DISTRICT COURTS—POWERS OF THE LEGISLATURE OF PORTO RICO IN REGARD THERETO.—Section 53 of the Organic Law of Porto Rico, correctly construed, empowers the Legislature of Porto Rico to change the organization, jurisdiction, number of judges, and the procedure of the district courts created by the military Government, and by the said Organic Act declared to be in force until modified by some later law, it being understood that this power to modify refers to the Legislature of Porto Rico, and not to the Congress of the United States.

ID.—LAW IN REGARD TO THE ORGANIZATION OF THE COURTS—ITS EFFICACY AND VALIDITY.—The law of March 10, 1904, in regard to the reorganization of the courts, is perfectly valid and efficacious because it contains no provision in conflict with the Organic Act, and by virtue thereof the distirct courts organized by that law are courts legally created.

GRAND JURY—INSULAR COURTS.—The provisions of Article 5 of the Amendments to the Constitution of the United States, according to which no person shall be held to answer for a capital or otherwise infamous crime, unless on presentment or indictment by a grand jury, do not apply to the insular courts.

AMERICAN CITIZENS.—American citizens residing in Porto Rico are amenable equally with natives and foreigners to the laws of the Island, and they cannot claim privileges of any kind basing their claim merely on the fact that they are citizens of the United States.

APPEAL—JURIES—CHALLENGES FOR CAUSE.—Where the accused challenges a juror for cause and this challenge is disallowed by the court, and the said juror is later challenged peremptorily by the accused, if the jury was impaneled without the accused having exhausted all his peremptory challenges, the exception taken because of the disallowance of the challenge for cause will not be available on appeal.

EVIDENCE—TESTIMONY OF AN ACCOMPLICE—CORROBORATION.—An accomplice should be examined in the same manner as any other witness, but his testimony should be admitted under the condition that it be corroborated; if there is no corroborating testimony, the jury, properly instructed by the court, should disregard it.

ID.—APPEAL—OBJECTIONS TO THE ADMISSION OR EXCLUSION OF EVIDENCE.—Any objection that is made against the admission or exclusion of evidence, should state in clear and precise terms the legal rule or principle violated by the trial court, otherwise the appellate court will not consider the merits of the same.

ID.—ERRORS WHICH PREJUDICE THE RIGHTS OF THE ACCUSED.—In order that the judgment of the trial court be reversed on the grounds that it admitted or excluded certain evidence, it is necessary that the rights of the accused should have been prejudiced in some way, and if he has not been prejudiced, the errors which may have been committed will not affect the validity of the decision.

ID.—EVIDENCE OF CONFESSION.—The principle which protects the rights of every defendant, and which should govern in the admission of evidence of confession in criminal cases, is that no one shall be obliged in a criminal case to give evidence against himself.

ID.—REQUISITES WHICH THE CONFESSION MUST CONTAIN TO MAKE IT ADMISSIBLE AS EVIDENCE.—The confession made by the defendant may be admitted as evidence against him provided that it was made freely and voluntarily and that he was not coerced into making it by threats or improper influences or promises by some one in authority or by hope of a lighter sentence or because of some benefit which he might receive.

ID.—CASES IN WHICH THERE IS DOUBT AS TO WHETHER OR NOT THE CONFESSION HAS BEEN MADE VOLUNTARILY.—When the proof as to whether or not the confession has been made voluntarily is in doubt and the court decides to admit it, the question should be submitted to the decision of the jury, instructing them that if after considering all the evidence, they arrive at the conclusion that the confession is not the voluntary act of the accused, it should be disregarded.

ID.—EVIDENCE SUBMITTED IN THE ABSENCE OF THE JURY.—On the trial the attorney for the accused asked the court that the testimony taken during the withdrawal of the jury in regard to the signing and delivery of the confession be read to the jury, which request the court refused, deciding that the witnesses should be examined in regard to the matter in the presence of the jury. The trial court committed no error in so deciding but even if it had, the error was cured by the examination of the witnesses in the presence of the jury.

ID.—TRIAL.—Although section 233 of the Code of Criminal Procedure sets forth the order which should be followed in the trial of a case, nevertheless under section 234 the court has power in its sound discretion to depart from the order set forth and its decisions on this point will not be reversed on appeal unless it clearly appear that they have prejudiced the rights of one of the parties.

ID.—WITNESSES—FAILURE TO INDORSE ON INFORMATION.—The provisions of section 142 of the Code of Criminal Procedure can not be construed to prevent a witness whose name is not indorsed on the information from testifying. The admission of testimony, of necessity, in a great many instances, must

be left to the sound discretion of the court, and its decisions will not be reversed unless it is proved that the rights of one of the parties have been prejudiced.

ID.—DOCUMENTS OFFERED AS EVIDENCE.—The parties have the right to examine any document which is presented as evidence before it is admitted but one of the parties may first examine a witness with regard to it and the other party can not ask that it be given to him for inspection until the time comes for him to cross-examine the witness, he having then the right to inspect it, and he must be given time in which to do it.

ID.—IMPEACHMENT OF THE VERACITY OF THE WITNESSES.—The party presenting a witness has the right to impeach his veracity by proving that on prior occasions he had made statements incompatable with his present ones and for that purpose may show him the document containing the said statements.

ID.—EXCEPTIONS WHICH DO NOT EXPRESS CLEARLY THE NATURE OF THE OBJECTION.—If an exception is not sufficiently clear to permit the appellate court to see the point involved, the decision of the trial court in regard thereto will be sustained.

BILL OF EXCEPTIONS—STATEMENT OF FACTS—DISCHARGE OF ACCUSED BECAUSE OF FAILURE OF PROOF.—In the cases in which there is no statement of facts and the bill of exceptions does not contain all the evidence taken at the trial, it will be presumed that there was sufficient evidence to justify a conviction and a decision of the court denying a motion to instruct the jury that it render a verdict of not guilty because of failure of proof will be sustained.

OBJECTIONS TO THE INSTRUCTIONS OF THE COURT.—The objections made to the instructions of the court should be made in clear and precise terms and especially must the grounds upon which they are based be stated, otherwise they will not be considered on appeal.

VERDICT—DEGREE OF CRIME.—In all those cases in which the crime is divided into different degrees, if the jury finds a verdict of guilty, it should specify in the said verdict the degree of the crime of which it finds the accused guilty.

ID.—EMBEZZLEMENT.—In a case where the jury finds the accused "guilty of the crime of embezzlement as charged," the verdict is sufficient to find the accused guilty of the crime of embezzlement, and this would be so even if the crime were divided into degrees.

APPEAL—PUNISHMENT IMPOSED ON THE ACCUSED.—In the cases in which the contents of the record do not contain proof that the judge of the trial court abused his discretional powers in imposing sentence within the limits allowed by statute the appellate court will not modify the sentence.

The facts are stated in the opinion.

*Mr. Pérez Moris* for appellant.

*Mr. Rossy, fiscal,* for respondent.

MR. JUSTICE MACLEARY delivered the opinion of the court.

The defendant in this case was accused of a felony, by information duly filed by the district attorney of San Juan, on the 23d of May, 1904, charging him with the embezzlement of $1,896.77, money belonging to the Union Club of San Juan,

which had been collected from its members and other persons. On the 28th of the same month he was duly arraigned and pleaded not guilty. On the 14th of September, 1904, at the conclusion of a trial lasting several days, the jury found him guilty as charged in the information. On the 17th of the same month he was sentenced by the court to three years' imprisonment in the penitentiary at hard labor, and the payment of all costs of the prosecution.

On the same day he gave due notice of appeal. On the 27th of March, 1905, a bill of exceptions was duly prepared and presented by counsel for defendant, to the trial judge, and by him duly signed on the 31st of May following. Defendant was admitted to bail in the sum of $2,000; and on 29th of June, 1905, the record on appeal was filed in this court.

After the filing of briefs for both The People and the defendant the case was heard, on oral argument, in this court on the 24th of October, 1905, and taken under consideration. The volume of the record and the numerous points presented in the bill of exceptions has caused the long delay in the decision, which has been unavoidable.

The bill of exceptions sets out forty-one separate and distinct errors which are alleged to have been committed on the trial of this cause, those being in some instances subdivided into two or more, reaching in one specification to nine. They will be examined in due course, either in groups or singly, and in such order as appears most logical and convenient.

First. The defendant demurred to the information on four grounds; to wit: .

(*a*) That the information is bad, in that it does not conform to the requirements of section 153 of the Code of Criminal Procedure, because it does not contain a statement of the acts constituting the offense in ordinary and concise language, and in such a manner as to enable a person of common understanding to know what is intended.

(*b*) That it does not conform to section 73 of the said

Code, inasmuch as the facts stated in the information do not constitute the offense of embezzlement.

(c) That it does not conform to section 153 of the said Code, inasmuch as there is an attempt to charge more than one offense, to wit:

. "In the first paragraph thereof the defendant as alleged is charged with the crime of embezzlement.

"And in the last part of the information there is said to be an attempt to charge the defendant with the crime of larceny."

(d) That it contains matter, which, if true, would constitute a legal justification or excuse for the offense charged, and because the facts as stated do not in themselves constitute an offense, contrary to paragraph 4 of the said section 153.

The defendant's counsel, some days after arraignment, moved the court for leave to withdraw his plea of "not guilty" and to present the foregoing demurrer to the information, which the trial court for sufficient reasons denied. Let us examine the reasons given by the trial court for the denial of the motion, which were the following:

"We have duly considered the motion of the accused in this case, that he be permitted to withdraw his plea of 'not guilty' and substitute therefor a demurrer to the information.

"In this case the *fiscal* presented his information duly sworn to on the 23d of May, 1904. Said information was read to the accused in open court on the same date, and the accused asked for time to file his answer through counsel, and the court granted five days for that purpose, at the expiration of which time the accused appeared in court accompanied by his attorney, and pleaded 'not guilty.' This occurred on the 28th of May, 1904.

"On July 21, 1904, this case was set for hearing on the 2d day of August on which date the hearing was postponed. The 18th of the present month, or to-morrow, was set then for the hearing. Counsel presenting the motion under consideration has been the attorney of record since the 1st of August, 1904.

"The Code of Criminal Procedure of Porto Rico expressly provides when the accused shall plead. At such time the accused in the

present case pleaded 'not guilty.' The case was subsequently continued to be prosecuted in accordance with the provisions of said Code, and this is the second time it had been set for trial. The law, therefore, does not provide that pleading may be withdrawn at the present time and that new allegations may be made. This opinion is based on the logical construction of our Code of Criminal Procedure, and on the work of Bishop, which on page 123 of the first volume of his work on criminal procedure, says:

"'Ordinarily under a rule of law or of a court, a demurrer should be made at a fixed period of the trial. If within that period the party should fail to make use of his rights, or if said party should take some other step later on, his right to take an exception must be considered as determined by waiver.'

"The law therefore is against the motion."

This ruling of the trial court was not only correct in the disposition made of defendant's motion, but it was based on sound principles well established in our criminal law.

It is very essential in the administration of justice, in the criminal courts of our country, that due order should be observed in all the proceedings, thus safeguarding, within the discretion of the court, the rights both of the accused and of The People. Of course this conformity to settled rules should not be extended beyond the limits prescribed in the statute, nor should the rigidity in their application make the rules of procedure an instrument of oppression instead of a protection against injustice. The provisions of our Code of Criminal Procedure in regard to these matters are eminently just and fair to all parties (Code Crim. Pro., Title VI, secs. 131 to 183).

Second. The defendant's counsel, not being allowed by the trial court to present their objections to the information by way of demurrer, made a motion to quash the same on substantially the same grounds, although couched in different words, as follows:

"1. That the information is bad, both in form and in substance.
"2. That it does not conform to the requirements of the Code of

Criminal Procedure, and especially to the requirements of section 153 of said Code.

"3. That the offense which it is attempted to charge is not charged.

"4. That there are in fact two offenses charged.

"5. That the defendant is called upon to defend himself against an uncertain and ambiguous charge; and in fact that he does not know whether he is charged with the offense of embezzlement or that of larceny.

"6. That even if all the allegations of the information were proven, that still the defendant would not have been proven to have committed any offense."

These objections are a substantial repetition of the grounds set out in the demurrer to the information; and had there been error in refusing to consider the demurrer at the time it was presented to the court, such error would have been cured by the consideration given by the court to this motion made later to quash the information. Let us try the information, by the rules laid down in the law, to test its sufficiency.

The information, as presented in the trial court, reads as follows:

"In the name and by the authority of The People of Porto Rico. *The People of Porto Rico* v. *James E. Kent.* In the District Court of San Juan, on the 23d day of the month of May, 1904.

"The district attorney presents an accusation against James E. Kent, a prisoner in the San Juan jail, for the crime of embezzlement, defined in section 448 of the Penal Code, committed in the following manner: B. R. Dix, on or about the 9th of May, 1904, was the treasurer of the Union Club, an organization established in the ward of Santurce of this city, for the recreation of its members; that on or about the date above mentioned, Mr. Dix as such treasurer, entrusted to the accused, James E. Kent, the duty of keeping the accounts and books of that office, authorizing him also to collect money which from different sources should be received in the treasury of said society, charging him with the duty of turning over such funds to the treasurer, said funds being the property of the club; that on or about the date above mentioned the said accused, James E. Kent, in the judicial district of San Juan, Island of Porto Rico, illegally and fraudulently

withdrew and applied to his own benefit the sum of $1,896.77, which money belonged to the said Club and had been collected from the members thereof and other persons, under the authority which had been conferred upon him by Mr. Dix; this act being contrary to the law in such case provided, and against the peace and dignity of The People of Porto Rico.—Signed: Jesús M. Rossy, district attorney.''

The first and second objections made to the information in the motion to quash it, are that the information is bad both in form and substance not conforming to the requirements of section 153 of the Code of Criminal Procedure in this, that it does not set forth the criminal acts in ordinary and concise language, so that a person of ordinary understanding could know what was intended. Reference is made in support of this objection also to sections 71, 72 and 73 of the Code of Criminal Procedure.

It has never been the practice in this court or in the inferior courts of this Island to require the same strictness in criminal pleadings as is required in many of the States of the American Union. No such requirements were enforced under the Spanish law, and when we passed from that system, on the 1st of July, 1902, we adopted a more liberal Code of Criminal Procedure than prevails in most of the States of the Continent. Our Codes, embodying the substantive and adjective criminal law, is taken almost literally from the Penal Code of California; and we have been accustomed to make constant reference to the decisions of the Supreme Court of that State when it is necessary to elucidate any obscure phrase or expression or to interpret the general effect of any criminal statute.

Under the well-established rule for the construction of statutes we are authorized to presume that the Legislature of Porto Rico, in adopting the California Code did so in view of the construction which had been put upon those statutes by the Supreme Court of that State. Where a statute is adopted from the Code of another State it is presumed to have been taken with its meaning as judicially determined in

the State from which it was adopted. So statutes originally enacted in another State, when adopted, are deemed to have been reenacted in view of the settled construction given them in the state from which they are copied (*Henrietta Mining & Milling Co.* v. *Gardner,* 173 U. S., 130; *Brown* v. *Walker,* 161 U. S., 600; *McDonald* v. *Hovey,* 110 U. S., 628; *Cathcart* v. *Robinson,* 30 U. S., 279; *Pennock* v. *Dialogue,* 27 U. S., 16; *Morgan* v. *Davenport,* 60 Tx., 230; *Munson* v. *Hallowell,* 26 Tx., 475; *Trigg* v. *State,* 49 Tx., 645; *Snoddy* v. *Gage,* 5 Tx., 106; *Brothers* v. *Mundell,* 60 Tx., 240; *Hess* v. *Pegg,* 7 Nev., 23; *Carney* v. *Hampton,* 3 T. B. Mon., 231; *Botanico-Med. College* v. *Atchison,* 41 Miss., 188; *Jessup* v. *Carnegie,* 80 N. Y., 441; *Leonard* v. *Columbia,* N. Co., 84 N. Y., 48; *Marqueze* v. *Cladwell,* 48 ·Miss., 23; *Ingraham* v. ` Regan,* 23 Miss., 213; *Parramore* v. *Taylor,* 11 Gratt., 242; *People* v. *Irvin,* 21 Wend., 128; *Kirpatrick* v. *Gibson,* 2 Brock., 388; *Harrison* v. *Sager,* 27 Mich., 476; *Daniels* v. *Clegg,* 28 Mich., 32; *Greiner* v. *Klein,* 28 Mich., 17; *Attorney General* v. *Brunst,* 3 Wis., 787; *Pike's Estate,* 45 Wis., 391; Sedgwick on Cons. Stat. & Cons. Law, sec. 363; Smith's Com. on Stat. & Cons. Law, sec. 634; Sutherland on Stat. Cons., 337).

· Our Code of Criminal Procedure contains a distinct limitation on the construction which we are authorized to place upon criminal pleadings in determining their sufficiency. Section 66 of the said Code reads·as follows:

"All the forms of pleading in criminal actions, and the rules by which the sufficiency of pleadings is to be determined, are those prescribed by this Code."

The objections made by defendant's counsel to the information, and which we are now considering, fall under sections 71, 72 and 73 of the Code of Criminal Procedure (Rev. Stat, pp. 638 and 639). These sections of the statute ·contain the requisites of an information, which should be followed by the *fiscal* in preparing such documents; providing that the facts stated in the information must constitute

an offense triable by the court. If the accusation conforms to these sections it is ordinarily sufficient. Comparing this information with the statutes it appears to be drawn correctly; and it requires the defendant to plead to it and stand his trial.

The third objection states specifically that the offense which it is attempted to charge, is not charged, evidently meaning thereby that the facts stated in the information do not constitute the offense of embezzlement, as required by section 73 of the Code of Criminal Procedure. The crime of embezzlement is defined in sections 445, 446, 447 and 448 of the Penal Code of Porto Rico as follows:

"Section 445.—Embezzlement is the fraudulent appropriation of property by a person to whom it has been intrusted."

"Section 446.—Every officer of Porto Rico, or of any municipality, city, or other civil division, and every deputy clerk, or servant of any such officer, and every officer, director, trustee, clerk, servant, attorney, or agent of any association, society or corporation (public or private), who fraudulently appropriates to any use or purpose not in the due and lawful execution of his trust, any property which he has in his possession or under his control by virtue of his trust, or secretes it with a fraudulent intent to appropriate it to such use or purpose, is guilty of embezzlement."

Section 447 has relation to carriers only and need not be quoted here, not being applicable in any point of view to this case.

Section 448 says.

"Every trustee, banker, merchant, broker, attorney, agent, assignee in trust, executor, administrator, or collector, or person otherwise intrusted with or having in his control property for the use of any other person, who fraudulently appropriates it to any use or purpose not in the due and lawful execution of his trust, or secretes it with a fraudulent intent to appropriate it to such use or purpose, is guilty of embezzlement."

Reference is expressly made to section 448 in the information which alleges in substance that Dix was the treasurer

of the Union Club and as such intrusted to Kent the keeping of the club books and the collection of its moneys, requiring him to turn them into the treasury of the club, and that Kent fraudulently took and applied the said money to his own use, to the amount of $1,896.77, which money belonged to the Union Club, and had been collected by Kent under authority from Dix the treasurer; ending with the usual formula.

Section 448 of our Penal Code is entirely similar to section 506 of the Penal Code of California; and under that statute a case arose in which the Supreme Court of that State took under consideration an indictment for embezzlement very much like the one before us now. It was in April, 1897, and the case is found in volume 116 of the California Reports. In this California case a guardian was charged with embezzling the property of his ward, and the indictment stated that 'the defendant being then and there intrusted with and having in his control the sum of $4,362 in lawful money of the United States, * * * as guardian, trustee, and agent of one Louis Litchneger, an insane person, for the use and benefit of said Louis Litchneger, then and there the property of and belonging to said Louis Litchneger, did then and there, to wit, at said city and county of San Francisco, on or about said 28th day of May, 1895, wilfully, unlawfully, feloniously, and fraudulently embezzle, convert, and appropriate the same to his own use, contrary, etc.''

This indictment was held sufficient on an objection almost identical with the one made here. We regard the decision rendered in that case as conclusively settling this point, against the accused (*People* v. *Page,* 116 Cal., 386).

The fourth and fifth objections to the information are that it attempts to charge two offenses, to wit: Embezzlement and larceny; and that the charge contained therein is uncertain and ambiguous, contrary to the second paragraph of section 153 of the Code of Criminal Procedure.

Embezzlement is regarded by many writers on criminal law as a species of theft or larceny, the difference being that

the articles, goods or property in the case of embezzlement are lawfully in the possession of the defendant, and in larceny they are taken from the possession of another. In both cases they are unlawfully appropriated to the use and benefit of the accused. The information, when fairly construed according to the proper import of the words used therein, charges the offense of embezzlement only, and not that of larceny; and it can not be held liable to the objection of duplicity made against it by defendant's counsel.

The last objection urged to the information is that it contains matters which if true constitutes a legal justification of the offense charged; and because the facts do not in themselves constitute an offense. This objection is not sound. It cannot be maintained that, because Dix was the treasurer of the Union Club, and as such intrusted to the defendant the keeping of his books and accounts and the collection of moneys belonging to the club, at the same time charging him with the duty of turning such funds over to the treasurer, the agent or servant Kent had the right to appropriate the money to his own use or could he be justified in so doing. This is the very act prohibited by law, and which under our statute constitutes the crime of embezzlement. It is neither excused nor justified by any law known to us, and, if we correctly understand the force of language, it constitutes an offense punishable under the Penal Code of Porto Rico.

It was further maintained that inasmuch as the moneys, alleged to have been embezzled, belonged to the Union Club, and were intrusted by Dix, and not by the club, to Kent, the appropriation of them by the latter to his own use is not embezzlement. In other words that the funds must have been intrusted by the owner to the accused, and if they passed in transit through the hands of a third person the offense cannot be classed as embezzlement. An examination of section 448 of the Penal Code, under which this information was drawn, will show this contention to be entirely fallacious. The idea

probably originated in the translation of the word embezzlement into the Spanish language by the term *abuso de confianza* (abuse of confidence). Perhaps a better word by which to translate the term embezzlement into Spanish would be *peculado,* or *estafa.* Be that as it may, we are following the English text of the Code. The agent is merely required to have within his control the money misappropriated and it matters not by whom it was intrusted to him. The same view of the law is sustained by an examination of sections 445 and 446 of the Penal Code, which have been heretofore copied.

3d. The counsel for the defendant then presented a plea in abatement alleging:

"That the court is not properly constituted, nor in accordance with law, and therefore has no jurisdiction over the person of the said defendant.

"Defendant says that said court in its organization 'is not in accordance with the Act of Congress of April 12, 1900, which requires that the jurisdiction of said courts and the form of procedure in them, and the various officials and attachés thereof respectively shall be the same as defined and prescribed in and by said laws and ordinances and said General Orders Nos. 118 and 195 until otherwise provided by law.

"Defendant further says that said General Orders No. 118, section 10, provides that each district court 'will be composed of three judges, one of whom shall be presiding judge, and who shall constitute a bench for civil and criminal business.'

"Defendant further says that said court as now constituted does not consist of three judges as provided in said General Orders and in said Act of April 12, 1900, but consists of one judge, which said judge has been improperly and illegally appointed, and has not jurisdiction nor authority to act as judge over the person of said defendant.

"Defendant further says that the said court has jurisdiction only as granted to it by the Act approved March 10, 1904, of the Legislative Assembly of Porto Rico, but he states that said act does not confer by its phraseology, either directly or indirectly any jurisdiction of any kind whatever, over the person of this defendant or the person of any other defendant who might be brought before the said court.

"Defendant further says that he has been informed and verily believes that the Hon. Juan Morera Martinez, president of the district

court of San Juan, as properly constituted and continued in existence by the said Act of Congress of April 12, 1900, has never resigned nor has been removed from the office of said president of said court, and that he has not been legislated out of said office; that the said Juan Morera Martinez is still president of the District Court of San Juan, and should, under the laws of Porto Rico, act in his official capacity at the trial by the jury of this said defendant.

"Deponent further says that the appointment of the Hon. Emilio del Toro was not, could not, in itself, deprive the said Juan Morera Martinez of his rights and his duty to occupy said bench, in the said San Juan District Court; that the appointment of said Emilio del Toro is unlawful and illegal, and contrary to the spirit and intent of the said Act of Congress of April 12, 1900.

"Defendant further says that he has been and would be greatly prejudiced by the said unlawful and illegal organization of the said district court, for that under the laws of Porto Rico now in force and in force at the time of the passage of the said Act of Congress of April 12, 1900, it was a privilege and right of defendant, charged with a felony, to have questions of law determined by three judges.

"Defendant for further plea says that he is a citizen of the United States of America, residing in Porto Rico, and that he has been deprived of his right to an indictment by grand jury, and has been forced to go to trial for felony without an indictment by a grand jury, but by presentment by a prosecuting attorney on information.

"Wherefore, the said defendant prays judgment, and that the proceedings against him be abated, and that he be discharged."

This plea in abatement was promptly overruled by the court, and defendant excepted. Let us examine the questions thus presented.

Of course the proposition set forth in the foregoing plea in abatement involved the construction of the Organic Act, commonly called the Foraker Law. That Act of Congress serves as a constitution for Porto Rico, and any law passed by the Legislative Assembly of this Island which is in conflict with the Organic Act is on that account a nullity. Under the Foraker Law the district courts of Porto Rico were continued as they existed at the date of the passage of that act, the 12th of April, 1900, but at the same time, in section 33 of

the Organic Act the Legislative Assembly was given "authority to legislate from time to time as it may see fit with respect to said courts, and any others they may deem it advisable to establish, their organization, the number of judges and officials and attachés for each, their jurisdiction, their procedure, and all other matters affecting them."

This power of the Insular Legislature to alter, modify or repeal the general orders mentioned in section 33 of the Organic Act, and the laws referred to in section 8 of the same act, is also plainly conferred by section 15 of the same Organic Act, which reads as follows:

"The Legislative authority hereinafter provided shall have power by due enactment to amend, alter, modify or repeal any law or ordinance, civil or criminal, continued in force by this act, as it may from time to time see fit."

The whole question in a nut-shell can be reduced to this: Does the language above quoted from section 33 refer to the district courts of Porto Rico, which were and are the trial courts having general jurisdiction over all felonies committed in the Island? It is said in the former part of the same section referred to that "the jurisdiction of said courts and the form of procedure in them, and the various officials and attachés thereof respectively, shall be the same as defined and prescribed in and by said laws and ordinances, and said General Orders, numbered 118 and 195, until otherwise provided by law." Does this mean until otherwise provided by law such as may be enacted by the Legislative Assembly of Porto Rico, or a law to be passed by the Congress of the United States? We have heretofore held in numerous cases, incidentally and directly, that this expression quoted from the Organic Act refers to laws which might be passed by the Legislative Assembly of Porto Rico, which under the first extract made from the Organic Act as above cited, gives authority to the Legislative Assembly to legislate from time to time as it may see fit with respect to said courts.

. And indeed it could not reasonably be held to apply to laws passed by Congress; for in such a construction the expression "until otherwise provided by law" would be useless and a mere waste of words. The Congress of the United States had, and still has, the power and the constitutional right to alter and amend the Organic Act of Porto Rico, and did not need to reserve such a right or power in the act itself. Taken in connection with section 15 of the same act there can be no reasonable doubt that the law referred to was an enactment of the Insular Legislature.

The expression "said courts" is used in both of the extracts from section 33 of the Organic Act, above set out, and according to our view plainly refers as well to the district courts of the Island as to any other inferior courts. We think the construction which the defendant's counsel appears to put upon the language of this section is entirely too rigid, and would thwart the purposes of Congress in passing the act to provide a civil government for Porto Rico.

And aside from all that has been said in the foregoing paragraphs in regard to the Judiciary Act of the 10th of March, 1904, we may very well consider the fact that it was passed nearly two years ago, and has been in active operation in this Island for something like twenty months, and during that time no effort has been made by any one to secure its annulment or revocation by the Congress of the United States. Although Congress ever since the date on which this act was passed, and ever since the American Government acquired sovereignty over this Island, has had the power, and still has, to revoke or annul all laws passed by the Insular Legislature, it has not attempted in a single case, so far, to exercise that authority. Thus by it non-action in the premises Congress may very well be said to have tacitly approved the Judiciary Act just as much as if a special act had been passed making the same changes in the constitution of the courts of this Island as were effected by that insular statute.

The Organic Act was not intended to go further than to

lay down general principles upon which such a government should be constructed and carried on; and it certainly was not intended to permanently adopt and continue in operation the courts and tribunals of Porto Rico as established by the General Orders Nos. 118 and 195 of the American military government just as they were constituted at that time, but it was, as it clearly appears to us, certainly intended to leave it to the Legislative Assembly to make such changes in the district and inferior courts, as to the jurisdiction and the number of judges and other incidental matters, as might be wise and expedient, from time to time, as civil government in the Island might progress in its development. We must accordingly hold that the District Court of San Juan at the time of defendant's trial, was properly constituted of a single judge and had jurisdiction of such felonies as that with which the appellant was charged.

This same question was raised in the *habeas corpus* case of Francisco Dones, *Ex parte,* decided by us in accordance with this view, on the 14th instant. Reference may be made to the opinion in that case for further discussion and a citation of authorities on this point.

As to the objection which defendant makes, in the same plea in abatement and in the exception taken to the ruling made thereon on account of the trial given him in the District Court of Porto Rico; claiming that he is a citizen of the United States of America, and cannot be tried for a felony unless indicted by a grand jury, we have to say that this position has no foundation whatever in law, constitutional or otherwise.

In discussing this question we need not consider the proposition that "the Constitution follows the Flag," more or less closely, nor the decisions made in regard to the extent in which the protection of the Constitution covers this Island or the other insular possessions of the American Government. For the purpose of this discussion it may be conceded that the rights guaranteed in the Fifth Amendment to the American

Constitution are enjoyed to their full extent by all the inhabitants of Porto Rico, natives or continentals. Article 5 of the Amendments to the Constitution of the United States certainly provides that no person shall be held to answer for a capital or otherwise infamous crime, unless on presentment or indictment by a grand jury, except in the case arising in the land or naval forces, or the militia when in actual service in time of war or public danger. This amendment to the Constitution has been repeatedly held by the Supreme Court of the United States and other Federal courts, to apply only to United States courts, and it has no application to State courts on the Continent (*Twitchell* v. *Com.,* 74 U. S., 324; *Barron* v. *Baltimore,* 32 U. S., 243; *Fox* v. *Ohio,* 46 U. S., 434; *Smith* v. *Maryland,* 59 U. S., 76; *Withers* v. *Buckley,* 61 U. S., 90; *Walker* v. *Sauvinet,* 92 U. S., 92).

It has also been repeatedly held by the highest judicial tribunal that the courts of the several Territories, organized temporarily for local government, are not United States courts within the purview of this section (*Clinton* v. *Englebrecht,* 80 U. S., 434; *Hornbuckle* v. *Toombs,* 85 U. S., 648; *Good* v. *Martin,* 95 U. S., 98; *McAllister* v. *United States,* 141 U. S., 184).

In our opinion the insular courts of Porto Rico fall under the same category, and the only court in Porto Rico which requires the services of a grand jury is the United States District Court for the District of Porto Rico. That court has no jurisdiction of the case at bar. It has been well said by the highest authority, that "a grand jury, whether of the State or of the United States, is empaneled and sworn to inquire into and present offenses against the Government only, under whose authority it is summoned (Story on the Constitution, sec. 1784). The grand jury, summoned and empaneled under the authority of a State, is the only appropriate body to inquire into any offense against the State, and to find or to ignore an indictment therefor. The duty of the grand

jury, attending a court of the United States, is limited to inquiring into and presenting offenses against the laws of the United States; and its proper advisers in matters of law, are the court and the attorney of the United States (*Virginia* v. *Paul,* 148 U. S., 119 and 120).

It has never been held by any court or maintained by any respectable authority with which we are acquainted, that an American citizen, in his travels around the world, or sojourning in foreign lands, carries with him all the rights guaranteed by the Constitution of his native land, and that, no matter where he may be or what crime he may commit, he is entitled to be charged therewith by a grand jury, whether such a body is provided for by the laws of the country where he is accused or not.

It would be a strange doctrine indeed that a citizen of the United States resident in Porto Rico should have special privileges over and above all other persons, either natives or foreigners resident here, simply because he is a citizen of the United States. And indeed the present claim made by the defendant is to privileges which he would not have in New York, Pennsylvania, Texas, California, or any other State of the American Union. To state the proposition in its nakedness is sufficient to refute it.

Fourth. An objection is made to the empaneling of the jury on the ground that it was summoned and organized by a court without authority to act. This constitutes the fourth exception in the bill contained in the record. This is merely presenting the same question as that set out in the third exception, under a different form, and its decision must abide the result of the one reached in the former. As we have held, the District Court of San Juan, as at present constituted, to be a legal court and to have jurisdiction of such criminal cases as the one at bar, it necessarily follows that the organization of the jury empaneled therein is not subject to the objection stated. The trial court had full authority to summon

and organize the jury which tried the defendant and it was properly constituted.

Fifth. The next exception is based on the following grounds: A challenge for cause was made to a juryman, one Otero, on the ground that he could not read nor write. This challenge was overruled by the court. After this ruling by the court the juryman was challenged by defendant peremptorily; but as the panel was finally filled without the exhaustion of defendant's peremptory challenges this objection is not available to him on appeal and needs no further notice. As jurymen in California are summoned and empaneled under a similar statute, we will refer to a few decisions from the Supreme Court of that State which sustain this view of the matter: *People* v. *Gatewood,* 20 Cal., 147; *People* v. *Gaunt,* 23 Cal., 156; *People* v. *Well,* 40 Cal., 268; *People* v. *McGungill,* 41 Cal., 429; *People* v. *Durrant,* 116 Cal., 179; *People* v. *Winthrop,* 118 Cal., 85.

Sixth. Objection was made to the testimony of the prosecuting witness, Benjamin R. Dix, being received or admitted, on the ground that it appeared from the information that he was an accomplice or an accessory to defendant in the offense charged, and should be allowed to testify only in corroboration of other evidence. This is reversing the rule in regard to the testimony of the accomplices. How is it possible to corroborate the testimony of any witness until it has been given to the court or jury? In order to corroborate there must be something with which the corroborating testimony can agree. In order to measure anything a rule of measurement must be used. Every comparison involves the use of a standard to determine points of agreement or difference. The proper method to follow in receiving the testimony of an accomplice is to examine him like any other witness, admitting his testimony subject to corroboration. If there is no corroborating evidence then his testimony should be disregarded by the jury, under proper instruction from the court. The objection that the witness was an accomplice in the crime charged

against defendant may be urged to the effect of the evidence, but not to its admissibility (*People* v. *Grundell,* 75 Cal., 301; *People* v. *Terry,* 84 Cal., 31; *People* v. *Armstrong,* 114 Cal., 570; *People* v. *Kunz,* 73 Cal., 313; *People* v. *Cloonan,* 50 Cal., 449; *People* v. *Cleveland,* 49 Cal., 577).

Had Dix therefore been an accomplice, which is not shown in the record, his testimony should have been received subject to corroboration to be weighed by the jury in considering its effect. This was a question for the jury under proper instructions from the court; and the testimony could not properly have been excluded for the reasons presented by defendant's counsel.

It might as well be stated here as elsewhere that there is nothing whatever in the record of this case to justify, or even to excuse or palliate, the violent attacks made upon this witness in the printed brief filed in this case and in the oral discussion indulged in by defendant's counsel on the hearing before this court. The reputation of Benjamin R. Dix as an honest man and a good citizen remains as bright and fair today as it did when this prosecution was begun.

Seventh. There were many objections made in the course of the trial to the testimony of Mr. Dix as it was given; these being embraced in exceptions 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, and 34. They will all be considered together.

The trial court must be allowed great latitude within the limits of the statute on that subject, in the exercise of the discretion necessarily confided to it in the admission or exclusion of evidence during the progress of the trial. Any objections, made to the evidence admitted or to the exclusion of such as is offered, should be clear and distinct, and the bill of exceptions setting forth the ruling of the court should plainly present the principle of law which has been violated by the court in the ruling of which complaint is made. Otherwise this court cannot revise the ruling of the court below. It must further appear that the party complaining was prejudiced in

some way by the ruling made by the trial court or the judgment cannot be reversed for such error (see Laws of 1905, p. 10). As it does not appear that the rights of the defendant were in any respect injured by any ruling made in regard to the testimony of the witness Dix, any error which may possibly have been committed on which the exceptions mentioned above are based, must be held to be harmless, and would not affect the judgment rendered.

Eighth. The 23d exception, presented in the bill was in regard to the admission of a letter written by Kent to Dix on the 12th of May, and generally, during the progress of this trial in this court and the court below, called a ''confession.'' In fact it is so denominated in the written paper itself.

Preliminary to its introduction, four witnesses, Dix, Harry, Dexter and Kent, testified as to the circumstances under which it was signed and as to promises which it was claimed were made to defendant as a condition to the signing and delivery of the same. The confession reads as follows:

''San Juan, Porto Rico, May 12th, 1904.—Mr. B. R. Dix, San Juan, P. R. My dear Mr. Dix: It is with the deepest humiliation and sincere regret that I have to make you the following confession: You will find upon examining the books and records of the Union Club, that I kept for you, as treasurer of said club, that I have received and appropriated to my own use about about eighteen hundred and ninety-six dollars and seventy-seven cents ($1,896.77). The method I have employed to keep this from you is by failing to charge up the full amount of initiation fees and stock subscriptions. I have also used part of the money turned in by the collector for club receipts for the bar, bowling alley and also sold forty (40) five dollar ($5) ticket books.

''I can offer no satisfactory excuse to you for this action; but will say this, that if given thirty days I will make good every cent. There is no use stating that I know the sacrifices you will have to make to make good the shortage I have caused you, but before God and these witnesses I will make good every cent if I live. Forgive me if you can.—Sincerely, James E. Kent; witness: Alfred A. Smith.''

The question of the admission or exclusion of this letter

is one of the most important in this case; since if it was prop-
erly taken into consideration by the jury no further evidence
of the defendant's guilt need to have been sought for or re-
lied on by the jury in making up their verdict.

As this statement furnishes the main point of contention
in the case as presented in this court, some elaboration in
discussing the general doctrine of confessions may be allowed.
In former cases this court has announced with some care the
general American doctrine on this subject, and quoted from
standard authors, like Greenleaf and Cooley, the principals
which courts should follow in the consideration of confessions
of the accused when offered in evidence. Reference may be
made in this connection to the two opinions delivered in the
case of Francisco Rivera, bearing date of the 25th day of
June, 1904, and the 9th day of December, 1905. In that case
the confession objected to was a verbal one, made to an offi-
cer while the defendant was under arrest, and in that respect
different and more liable to exclusion than the one now under
consideration; yet it was nevertheless admitted. But the zeal
and earnestness with which the matter has been urged upon
our attention may justify an entirely new and more extensive
examination of the principles and authorities which should
govern in cases of this nature.

The protecting aegis which the common law throws around
the life and the liberty of the citizen has long been the boast of
English-speaking people throughout the world. The rack and
thumbscrew have for centuries been banished from their
courts of justice. It was, when our Government was founded
in 1776, a well-established principle of the common law that
no person accused of crime could be compelled to give evi-
dence against himself. Forcing a man to be a witness against
himself is contrary to the fundamental principles of a re-
publican government. This great principle was deemed so
important by the founder of our Republic that it was incor-
porated into the Bill of Rights, contained in the original

Amendments to the Constitution proposed and adopted almost simultaneously with that great charter of our liberties, the National Constitution itself. The language reads: "No person shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property, without due process of law." See the Fifth Amendment to the Constitution. This is the foundation of all laws and the basis of all judicial decisions guarding the rights of the accused in the admission of confessions to be used against him in a trial for crime. The same prohibition that is found in the Fifth Amendment to the Constitution of the United States forbidding the compulsion of any person to give evidence against himself is reproduced in the section 7 of our Code of Criminal Procedure. Compulsion is the keynote of the prohibition. If there is no compulsion the confession does not fall within this constitutional inhibition.

The admissibility of this paper as a confession depends on the fact of its having been entirely voluntary. This question must be determined by the evidence which we will rehearse in a condensed form.

B. R. Dix, to whom the letter was addressed, testified in effect as follows: That he took the document to the house where Kent lived; that Kent read the letter before signing it, and that there was a short discussion between them in regard thereto; that Kent asked if he wished to use the document to prosecute him before the courts, and that he (Dix) replied that the books and documents of the Union Club were in such a condition that they would convict him before any court; that he never promised Kent not to use the letter against him; that he promised Kent nothing; that he does not remember whether Kent, at the time he signed the letter, was employed in the Treasury Department, as he does not remember the date on which he was discharged; that he was employed in that department until discharged by the Treasurer, and had been for several years prior to that time; that he was a bookkeeper or assistant bookkeeper; that Kent's object

in signing the document is clear on the face of the same; that Kent had said that he wished to do all he could to help him (Dix), and that he presumes that he signed it hoping he (Dix) would be a little easier on him; that at the time the document was signed he did not promise Kent to be easy on him, but that he did make such a promise when Kent offered to return the money if he would wait on him three weeks until he could write to the States, which occurred before the document was signed; that he had promised Kent, on the advice of counsel, that if he would return the money he would not prosecute him; that Kent evidently signed the letter in the hope that he would be dealt with more considerately, and would be assisted to get out of the trouble, and also, possibly, to protect him (Dix); that the document was written on the 8th, by witness, but not being able to obtain the signature on the same day, he changed the date to that on which it was signed; that as already stated, he wrote the letter, couching the same in the language used by Kent in a personal conversation with him; that probably the same words used in the letter were expressed in the confession made in the presence of Mr. McCormick; that in view of the fact that Kent had not been arrested, and fearing that he would leave the Island, he wrote the letter, probably in the very words used by Kent, and took it to the latter personally at his house, showed him the document and that he read it; that he told Kent he wished him to sign it, to which the latter seemed willing; that before signing, he required him to call a witness to his signature, which Kent did, personally calling a friend with whom he lived, and both Kent and the witness, who was Alfred A. Smith, signed the document, the former as his confession and the latter as witness; that he knows the two signatures at the bottom of the letter are those of Smith and Kent, because they both signed in his presence, in Smith's house, where Kent was living; that he does not remember whether the signatures were attached before or after dinner, but that it was after office hours; that he does not know where Mr. Smith is; that he left the Island and

went to Panama, and that he later heard that he was in New Orleans.

Mr. L. D. Harry testified in substance as follows: That the two signatures appearing at the end of the document which was handed him were those of James E. Kent and Alfred A. Smith; that he knows this to be a fact, because he knows Kent's signature, but about that of Smith he is not sure; that he has not seen Smith's signature many times, but he is sure about Kent's signature.

Frank H. Dexter, Esq., testified substantially as follows: That he was at one time temporarily Kent's counsel; that he accompanied Mr. Kent when the latter went to see Dix; that he had never before seen the document (which was presumably) handed him on the witness stand for inspection; that something was said in the conversation referred to in regard to a document; that the conversation was in regard to a written confession; that the persons present when the conversation took place were Dix, Kent and the witness, and during the course of the conversation reference was made by Kent to a confession, complaining to Dix that he was not carrying out his promise; that Dix then showed his willingness to carry out the promise; that he as counsel for the accused, believing that the confession had not been voluntary, and that it was irregular and should not be used against the accused, and that as it had been made under promise of being relieved from all criminal responsibility, spoke to Dix and told him that he thought that document ought not to be used against the accused; whereupon Dix replied to witness that he intended to fulfill his promise to Kent, but that there was something in the manner in which he expressed himself from which witness gathered that Dix should not retain him (Kent) in his position, and in view of the fact that proceedings had already been begun which Dix could not control, that the latter would necessarily be governed by future developments. To questions put by the *fiscal,* witness testified that he did not remember the date on which the conversation occurred, but that it

occurred after Kent's arrest; that he can only say that the
words used by Dix to him were somewhat reserved; that in
the conversation reference was made to a confession of guilt
made by Kent; that Dix mentioned a written confession which
he had in the iron safe; that this was a few days after the
arrest of Kent; that he could not say positively that that doc-
ument contained the confession referred to, because he had
never seen the document until this moment; but that the con-
tents of the document and the subject of the conversation are
substantially the same.

The defendant Kent, in his own behalf, testified in brief
to the following effect: A document being exhibited to the
defendant, and he being asked who wrote it, replied that it
was written by B. R. Dix and signed by himself; that Dix went
to his residence on a Thursday (the 11th or 12th), and was
walking up and down in front of the door, while someone went
upstairs; that Dix stated that he had a document in his pocket
which he desired him to sign; that he then turned to Mr. Dix
and said: "Mr. Dix, do you not understand that to sign such
a paper as that would be a fatal admission." That Dix then
stated that he did not intend to make use of the document
under any consideration; that a conversation of four or five
minutes' duration then ensued before he signed the document,
in which conversation Dix told him that his reason for wish-
ing to have the document signed was that in case the defend-
ant should acquire any property in the future, after this ques-
tion should have been adjusted, he would have something to
show, and his promise was that if he should sign the docu-
ment he would not institute proceedings against him; that he
signed the document because if the circumstances connected
with the matter were such that if they should come to public
knowledge would be more prejudicial than signing the docu-
ment two or three times more than appeared; that the prom-
ise made by Dix was that if he would sign that document the
proceedings instituted against him would be stayed; and that
he signed the same simply to stop proceedings where they

were then; that this was not done until Saturday, 14th; that he
was present at the conversation mentioned by Mr. Dix; that
he recognizes the signature of Mr. Smith; that Smith did not
read the document; that when he came into the room defend-
ant asked him to sign in witness of his signature; that his
reason for asking Smith to sign was that Dix insisted on a
witness to his signature; that he does not know whether pro-
ceedings can be stopped at the will of the injured person or
not, but that the proceedings had not yet commenced when
he signed; that this took place on Thursday and the arrest
was not made until Saturday; that the document was given
under the promise that proceedings would be stayed; being
asked if proceedings had been commenced, he replied that he
was told that the matter was known to only three persons;
that the press had said nothing until the following Saturday.
This is the substance of all the testimony bearing on the cir-
cumstances under which the confession was made. It is well
to keep clearly in mind what a confession really is, as that
term is used in our criminal law. No better method of fixing
in the discussion can be taken than by referring to that stand-
ard lexicographer Bouvier in the volumes so ably edited by
Dr. Francis Rawle.

Bouvier defines a *confession* as follows:

"*Confession in criminal law*, the voluntary declaration made by
a person who has committed a crime or misdemeanor, to another, of
the agency or participation which he had in the same.

"An admission or acknowledgment by a prisoner, when arraigned
for an offense, that he had committed the crime with which he is
charged.

"*Judicial confessions* are those made before a magistrate or in court
in the due course of legal proceedings.

"*Extra-judicial confessions* are those made by the party elsewhere
than before a magistrate or in open court." (1 Bouvier's Law Dic-
tionary, p. 378, and cases there cited.)

Of course this paper, if it is classed as a confession at all,

must be regarded as an extra-judicial one. Having this testimony and the definition given in view let us examine the judicial decisions in regard to the subject of confessions. The United States Supreme Court has laid down the law in regard to the admission of evidence of confession in criminal cases as set forth in the following leading cases.

Mr. Justice White in the opinion handed down by him in the Bram case uses the following language:

"This was an indictment for murder alleged to have been committed on an American vessel on the high seas. After the crime was discovered. Brown, a sailor, was put in irons, and the vessel was headed for Halifax. Before it reached there Brown charged Bram with the commission of the crime, saying that he had seen him do it. Bram was then also put in irons. On the arrival at Halifax, Power, a police-man and detective in the government service at that place, had a conversation with Bram. Bram was indicted at Boston for the commission of the crime, and on his trial Power was offered as a witness for the Government. He testified that he made an examination of Bram, in his own office in the city hall at Halifax, when no one was present besides Bram and himself; and that no threats were made in any way to Bram, nor any inducements held out to him. The witness was then asked: 'What did you say to him and he to you?' To this defendant's counsel objected. The defendant's counsel was permitted to cross-examine the witness before the court ruled upon the objection, and the witness stated that the conversation took place in his office, where he had caused the defendant Bram to be brought by a police officer; that up to that time the defendant had been in the custody of the police authorities of Halifax; that the witness asked that the defendant should be brought to his office for the purpose of interviewing him; that at his office he stripped the defendant and examined his clothing, but not his pockets; that he told the defendant to submit to an examination, and that he searched him; that the defendant was then in custody and did everything the witness directed him to do; that all this took place before the defendant had been examined before the United States consul, and that the witness did not know that the local authorities had at that time taken any action, or that the defendant was held for the consul general of the United States. The witness answered questions by the court as follows: Q. 'You say there was no inducement to him in the way of promise or expectation of advantage?'—A. 'Not any, your honor.' Q. 'Nor anything said in the way

of suggestion to him that he might suffer if he did not—that it might be worse for him?'—A. 'No, sir; not any.' Q. 'So far as you were concerned, it was entirely voluntary?'—A. 'Voluntary, indeed.' Q. 'No influence on your part exerted to persuade him one way or the other?'—A. 'None whatever, sir; none whatever.' The defendant then renewed his objection to the question, what conversation had taken place between Bram and the witness, for the following reasons: That at the time the defendant was in the custody of the chief of police at Halifax; that the witness in an official capacity directed the police authorities to bring defendant as a prisoner to his office and there stripped him; that the defendant understood that he was a prisoner, and obeyed every order and direction that the witness gave. Under these circumstances the counsel submitted that no statement made by the defendant, while so held in custody and his rights interfered with to extent described, was a free voluntary statement, and no statement made by him bearing upon this issue was competent. The objection was overruled, and the defendant excepted on all the grounds above stated, and the exceptions were allowed. The witness answered as follows: 'When Mr. Bram came into my office, I said to him: "Bram, we are trying to unravel this horrible mystery." I said: "Your position is rather an awkward one. I have had Brown in this office, and he made a statement that he saw you do the murder." He said: "He could not have seen me; where was he?" I said: "He states he was at the wheel." "Well," he said, "he could not see me from there." I said: "Now look here, Bram, I am satisfied that you killed the captain from all I have heard from Mr. Brown. "But," I said, "some of us here think you could not have done all that crime alone. If you had an accomplice, you should say so, and not have the blame of this horrible crime on your own shoulders." He said: "Well, I think, and many others on board the ship think, that Brown is the murderer; but I don't know anything about it." He was rather short in his replies.' Q. 'Anything further said by either of you?'—A. 'No; there was nothing further said by either of us.' The direct examination of this witness was limited to the interview between the witness and the defendant Bram. *Held:*

"(1) That this statement made by the accused to a police officer, was evidently not a voluntary confession and was not admissible in evidence against him;

"(2) That the objection to its admission having been twice presented and regularly allowed, it was not necessary that it should be renewed at the termination of the testimony of the witness." (*Bram* v. *United States*, 168 U. S., 532, 533.)

In this case the opinion of the court was delivered, as heretofore stated, by Mr. Justice White, but a dissenting opinion, written by Mr. Justice Brewer, and concurred in by Mr. Chief Justice Fuller and Mr. Justice Brown, was read in which strong grounds are taken against the views expressed in this decisions, and the confession of Bram are considered under the evidence stated to have been voluntary, and admissible in evidence.

The same high court, in another noted case, had previously ruled in regard to this matter as follows:

"The true test of the admissibility in evidence of the confession of a person on trial for the commission of a crime is that it was made freely, voluntarily and without compulsion or inducement, and this rule applies to preliminary examinations before a magistrate of persons accused of crime.

"When there is a conflict of evidence as to whether a confession is or is not voluntary, if the court decides that it is admissible, the question may be left to the jury, with the direction that they should reject it if, upon the whole evidence, they are satisfied that it was not the voluntary act of the defendant." (*Wilson* v. *United States*, 162 U. S., 613.)

In another case the same high tribunal uses the language following:

"The admission of certain statements made by the defendants while they were under arrest and handcuffed, was also objected to. No exception was taken to the admission of this testimony, and the court properly held that the mere presence of officers is not an influence. Confessions are not rendered inadmissible by the fact that the parties are in custody, provided that such confessions are not extorted by inducements or threats (*Hopt* v. *Utah*, 110 U. S., 574, 583; *Sparf* v. *United States*, 156 U. S., 51, 55.) The so-called confessions show merely that the defendants acted in a somewhat suspicious manner when first arrested, saying: 'If we killed him, you prove it; that is for us to know and you to find out.' And that they refuse to tell their names. There was clearly no objection to this testimony." (*Pierce* v. *United States*, 160 U. S., 357.)

In another case the Supreme Court said:

"We are of opinion that as the declarations of Hansen to Sondergren were not, in any view of the case, competent evidence against Sparf, the court, upon objection being made by counsel representing both defendants, should have excluded them as evidence against him, and admitted them against Hansen. The fact that the objection was made in the name of both defendants did not justify the court in overruling it as to both, when the evidence was obviously incompetent and could not have been competent against Sparf, and was obviously competent against Hansen.

"It was not necessary that counsel should have made the objection on behalf of one defendant and then formally repeated it in the same words, for the other defendant. If Sparf had been tried alone a general objection in his behalf on the ground of incompetency would have been sufficiently definite. Surely, such an objection coming from Sparf when tried with another ought not to be deemed ineffectual because of the circumstance that his counsel, who by order of the court represented also his codefendant, incautiously spoke in the name of both defendants. Each was entitled to make his own defense, and the jury could have found one of them guilty and acquitted the other. (*Mutual Life Ins. Co.* v. *Hillmon*, 145 U. S., 285, 293; See also *Commonwealth* v. *Robinson*, 1 Gray, 555, 560.)

"Confessions of a person imprisoned and in irons under an accusation of having committed a capital offense are admissible in evidence against him if they appear to have been voluntary, and not obtained by putting him in fear or by promises." (*Sparf and Hanson* v. *United States*, 156 U. S., 58.)

In another well-considered case Mr. Justice Harlan, in delivering the opinion of the Supreme Court of the United States, uses the following pertinent language:

"While some of the adjudged cases indicate distrust of confessions which are not judicial, it is certain, as observed by Baron Parke in *Regina* v. *Bald*, 2. Den. (English) Cr. Cas., 430, 445, that the rule against their admissibility has been sometimes carried too far, and in its application justice and common sense have to frequently be sacrificed at the shrine of mercy. A confession, if freely and voluntarily made, is evidence of the most satisfactory character. Such a confession, said Eyre (C. B. 1 Leach, 263), is deserving of the highest credit

because it is presumed to flow from the strongest sense of guilt, and therefore, it is admitted as proof of the crime to which it refers.

"Elementary writers of authority concur in saying that, while from the very nature of such evidence it must be subjected to careful scrutiny and received with great caution, a deliberate, voluntary confession of guilt is among the most effectual proofs of the law, and constitutes the strongest evidence against the party making it that can be given of the facts stated in such confession.    (1 Greenleaf Ev., sec. 215; 1 Archnold Cr. Pl., 125; Philips' Ev., 533-34; Starkie Ev., 73.)

"But the presumption upon which weight is given to such evidence, namely, that one who is innocent will not imperil his safety or prejudice his interests by an untrue statement, ceases when the confessions appear to have been made either in consequence of inducements of a temporal nature, held out by one in authority, touching the charge preferred, or because of a threat or promise by or in the presence of such person, which, operating upon the fears or hopes of the accused, in reference to the charge, deprives him of that freedom of will or self-control essential to make his confession voluntary within the meaning of the law.    Tested by these conditions, there seems to have been no reason to exclude the confession of the accused; for the existence of any such inducements, threats or promises seems to have been negatived by the statement of the circumstances under which it was made."    (*Hopt* v. *Utah,* 110 U. S., pp. 584 and 585.)

In the cases quoted from the Supreme Court of the United States, the defendants making the confessions, Bram, Wilson, Hopt, Hansen and Pierce, were all prisoners at the time the confessions were made; and in some cases in irons. This in itself rendered careful inquiry as to compulsion necessary and in this particular these cases naturally differ from the case at bar.

The California decisions with regard to confessions made in criminal cases, are in harmony with those of the Supreme Court of the United States, and to the following effect: .

"The confessions of the defendant to the effect that he was guilty of the crime, and that he assisted in forcibly taking the money from Nevis, were admitted in evidence.    Defendant claims that such confessions were not free and voluntary, and were made under the inducement of a promise that it would go easier with him if he would

confess. Three witnesses for the prosecution testified to the effect that the confessions were voluntary on the part of defendant, and not made under the influence of threats, intimidations, promises or inducements of any kind. It was attempted by defendant's testimony to show that promises were made to him that it would be made easier for him if he would confess. We do not think the defendant's evidence clearly shows any such promises, but, if it did, the jury, under proper instructions from the court, were the sole judges of the credibility of the witnesses in regard to the matter. It would be a strange rule that would allow the confessions of a defendant to be given in evidence upon clear proof that they were made voluntarily and without any promise, threat, or inducement, and then allow them to be stricken out upon the defendant testifying that they were made under the fear of a threat or the influence of a promise. If such were the law, it would always lie in the power of a defendant to clear away from the case all confessions by his own evidence, and this regardless of the truth of such testimony. (*People* v. *Oliveria,* 127 Cal., p. 381.)

"There is no substantial merit in the other points made. It was not error to admit oral evidence of statements and declarations made by defendant other than those contained in his written confession. The latter was not the best or any evidence of anything but its own contents. Nor was it any objection to the admission of the written confession that it appeared to have been made by defendant under a state of great excitement. This fact might affect its consideration by the jury, but not its admissibility. (*People* v. *Gokanhour,* 120 Cal., p. 254.)

"One of the confessions introduced was a letter written by the defendant when in jail to the prosecuting witness. The defendant testified that the letter was written at the request and on the advice of her mother, who visited her at the jail with one Oxendine, and told her that she had consulted an attorney, who advised the writing of the letter. In this connection, the defendant offered to prove by her own testimony, and by the testimony of her mother and of Oxendine that at that conference she told them she was entirely innocent. The court excluded the evidence. *Held:* That the ruling was error, as the conference and the writing of the letter should be considered as one transaction. (*People* v. *Yeaton,* 75, Cal., p. 416.)

"The statement of the defendant to the witness, Sarah C. Kirby, did not constitute a 'confession,' admissible only after proof that it was made voluntarily. A confession is a person's declaration of his agency or participation in a crime. The term is restricted to acknowledgments of guilt (*People* v. *Strong,* 30 Cal., 157; 1 Greenleaf Ev.,

170). An admission of a fact, not in itself involving criminal intent, is not to be rejected as evidence (without the preliminary proof) merely because it may, when connected with other facts, tend to establish guilt. The statement of the defendant objected to was, at most, an admission that he had taken improper liberties with the prosecutrix, or had with her consent attempted carnal intercourse with her. However immoral his conduct, his admission was not a confession of his guilt of the crime for which he was indicted (rape) nor of any offense included in that crime. (*People* v. *Parton,* 49 Cal., p. 638.)

"The evidence conclusively shows that inducements were held out to defendants by the sheriff having them in custody, two days before their preliminary examination to confess. They were told by the sheriff that it was no use for them to deny taking the property; that there was evidence enough to convict them; that it would go lighter with them to confess. And the evidence of the sheriff sufficiently shows that, after he had thus threatened and advised the prisoners, they did confess to him; but the purport of such confessions does not appear, further than they told him about the grain, and did not deny taking it. It is very clear that any statements or confessions they may have then made to the sheriff were not voluntary, and could not properly have been given in evidence against them on the trial. And it is equally clear that if their confession or statement, made before the examining magistrate two days thereafter, was a repetition of the statement made to the sheriff, or any material portion of such previous statement, the entire statement or confession made to and before the examining magistrate should have been excluded as evidence, by reason of the same having been originally made under such inducements held out to them as to exclude the first confession. The law presumes the subsequent confessions to have been made and influenced by the same hopes and fears as the first, and this presumption continues until it be affirmatively etablished by the prosecution that the influences under which the original confession was made had ceased to operate before the subsequent confession was made. (*State* v. *Roberts,* 1 Dev., 259; *Peter* v. *State,* 4 Sm. & Marsh., 3; *State* v. *Gould,* 5 Halsted, 163; *Deathridge* v. *State,* 1 Sneed, 75; 2 Russ. on Cr., 834; 1 Wharton Am. Cr. Law, Sec. 694; *People* v. *Johnson,* 41 Cal., pp. 454, 455.)

"Confessions which are entirely voluntary when made are admissible in evidence, even if, on a prior occasion, some promise of favor not acted upon, and which had ceased to be operative, had been made to induce the accused to confess. The question as to the admissibility

of confessions is one for the exercise of a sound judicial discretion, to be guided by the circumstances of each particular case. (*People* v. *Jim To,* 32 Cal., pp. 60, 61.)

"A confession, in criminal law, is a voluntary declaration, made by a person who has committed a crime or misdemeanor, to another, of the agency or participation he had in the same (Bouv. Dic. Confess.). The word 'confession' is not the mere equivalent of the words 'statements' or 'declarations.'" (*People* v. *Strong,* 30 Cal., pp. 157 and 158.)

Naturally we are inclined to give great weight to the opinion of the Supreme Court of the United States, and those of the highest court in California, from whose statutes our criminal laws were adopted. But similar decisions can be found in almost all the States.

These quotations might be indefinitely extended but those already made are more than sufficient. A few of the most pertinent cases in regard to confessions may be enumerated as is done in the following list: *Bram* v. *The United States,* 168 U. S., 532; *Wilson* v. *The United States,* 162 U. S., 613; *Pierce* v. *The United States,* 160 U. S., 355; *Sharf* v. *The United States,* 156 U. S., 51; *Hopt* v. *Utah,* 110 U. S., 574; *Pepple* v. *Oliveria,* 127 Cal., p. 381; *People* v. *Cokanhour,* 120 Cal., p. 254; *People* v. *Yeaton,* 75 Cal., p. 416; *People* v. *Parton,* 49 Cal., p. 638; *People v. Johnson,* 41 Cal., pp. 454, 455; *People* v. *Jim To,* 32 Cal., pp. 60, 61; *People* v. *Strong,* 30 Cal., pp. 157, 158; *Cain* v. *State,* 18 Tx., 390; *Searcy* v. *State,* 28 Tx. App., 514; 19 Am. St. Rep., 851; *Lauderdale* v. *State,* 31 Tx. Cr. App., 50; 37 Am. St. Rep., 788; *Grimsinger* v. *State,* 44 Tx. Cr. App., 1.

The confession in the case at bar not falling within the inhibitions mentioned in the authorities herein quoted was properly admitted for the consideration of the jury in connection with the other evidence.

It has been suggested that in cases of this kind it is proper for the trial judge in his charge or instructions to the jury to submit the confession to them accompanied by the evidence that is taken in regard to the circumstances under which it

was made, and to let them decide whether it was voluntary or made under the influence of fear, threats, or promises of immunity or assistance, or other improper motives. This is the practice in some States, and where there is any doubt about the confession being the voluntary act of the accused, made freely by him without any undue influence, it would be proper to take such a course. This practice was approved by Mr. Justice Shepard (now Chief Justice) in the case of *Hardy* v. *The United States,* decided by the Court of Appeals of the District of Columbia on 11th of December, 1893 (3 Dist. Col. App., 35). Mr. Chief Justice Fuller, in the *Wilson case,* cited herein on another point, in delivering the opinion of the Supreme Court of the United States, on the 27th of April, 1896, in which he cites the *Hardy case,* took the same ground and announced:

"Where there is a conflict of evidence as to whether a confession is or is not voluntary, if the court decide that it is admissible, the question may be left to the jury with the direction that they should reject the confession if upon the whole evidence they are satisfied that it was not the voluntary act of the defendant." (162 U. S., 624.)

The trial court is always safe in taking this course, and should carefully observe it in doubtful cases. And, in the case at bar, the action of the court, in rehearing in the presence of the jury the evidence of the witnesses Dix, Harry, Dexter and Kent, as to the circumstances under which the confession was given, and in commenting on it, and in other expressions used in the charge, practically amounts to such instruction. But even if the judge had simply admitted the confession in evidence before the jury without any qualifying instructions, under the view which we take of the confession, it would not have been a material error.

This confession in the case at bar when tested by the law and the facts presented in the numerous authorities quoted and cited appears to have been made without compulsion or undue promise or inducement, and to be entirely voluntary.

A conversation appears from the record to have taken place, at some time previous to the date of the letter, between Dix and Kent in the presence of the Reverend Mr. McCormick. Dix afterwards reduced the statements made by Kent in that conversation to the form of a letter, as he says, almost word for word. With this letter in his pocket Dix went alone to Kent's house on Thursday, two days before the arrest and after Kent had been discharged from his position in the Treasury Department. There he met Kent and they had some five minutes' conversation at the door before they entered the dwelling, and then went into the house where Kent signed the letter, and at the suggestion of Dix called Smith to witness it, which he did. In the conversation between Dix and Kent, if the testimony of the former is to be believed, nothing transpired in the way of an inducement or a promise in order to secure Kent's signature to the document; if the latter spoke the truth in his testimony, the contrary is the fact. Dix says in effect that in reply to a question of Kent, asking him if it was designed to use the document in prosecution against him (Kent), he (Dix) said to Kent that the books and documents of the club were sufficient to convict him, and that no promise whatever was made to Kent; that he presumes that Kent signed the letter hoping that he (Dix) would be a little easier on him, but that he did not promise to be so, but that on another occasion he had promised Kent that if he would return the money he (Dix) would not prosecute him (Kent).

Kent says substantially that Dix stated that he did not intend to use the document under any consideration; that he only wished it in case he (Kent) should acquire any property he (Dix) would have something to show; and he promised that if he would sign the document he (Dix) would not institute proceedings against him (Kent), or that proceedings would be stayed, and he signed for that reason. Of course the court or the jury as the case may be must choose which of two contradictory statements made by the witnesses is worthy of credence. The choice has been made in favor of

the statement made by Dix. We think that this selection was entirely correct. No great weight can be given to the unsupported testimony of the defendant making the confession in such cases. Aside from the fact that the accused is greatly interested in excluding the confession from the record, if he could by such means succeed in doing so, very seldom if ever could the confession of a prisoner become evidence against him. Besides all the circumstances surrounding this case go to show that the confession was purely voluntary. The letter, although prepared under the direction of Dix, was virtually dictated by Kent. Dix went to the residence of Kent alone, and they met there on a perfect equality. Kent was no longer Dix's subordinate in official position. He was free from arrest, in his own house, surrounded by friends, perfectly free to do as he pleased, and no compulsion or persuasion was used to influence him. Of his own accord he signed the document and called one of his own friends to witness it and delivered it to Dix. If there ever was a voluntary confession it is the one contained in this record. The trial judge was right in admitting it in evidence and the jury were justified in considering it, if they did so, in making up their verdict.

Ninth. The defendant in the thirty-fifth and thirty-sixth exceptions presented the question of reading to the jury the testimony taken during their withdrawal in regard to the signing and delivery of the confession. The court refused to have the testimony read to the jury, but permitted the witness to be fully examined again on that matter, which was the better plan, and was entirely correct. The defendant, even if the ruling had been wrong, was not, in view of the subsequent action of the court in permitting an examination of the witnesses in the presence of the jury, prejudiced by the action of the court, and such an error would have been no ground for a reversal of the judgment of conviction. The rights of the defendant, in regard to the preliminary proof on the admission of the letter denominated a confession, were fully

safeguarded by the court, and there is nothing in this proceeding of which anyone can complain.

Tenth. The defendant, by this thirty-seventh exception, contended that the confession not having been read to the jury at the time it was presented could not afterwards be read in evidence to the jury by the *fiscal.* The court, in consideration of the fact that the confession was written in English, and had already been translated into Spanish by the official interpreter for the information of the jury, and the translation accepted by all parties as correct, permitted the reading to be made in English, as it was written.

Under section 233 of the Code of Criminal Procedure the trial of a case is required to proceed in a certain order "unless otherwise directed by the court." The next section reads as follows:

"Section 234.—When the state of the pleadings requires it, or in any other case, for good reasons, and in the sound discretion of the court, the order prescribed in the preceding section may be departed from."

This section is identical with section 1094 of the Penal Code of California. The Supreme Court of that State, in interpreting that statute, says that the court, in exercising the discretion confided to it by this act, need not state any reason for the ruling made, and on appeal it will be held that the discretion was wisely exercised, unless there has been a manifest abuse of its discretion (*People* v. *Gordon,* 103 Cal., 568; *People* v. *Strong,* 48 Cal., 303; *People* v. *Ham,* 44 Cal., 96).

This was a matter entirely within the discretion of the trial court; which, in the details of the trial, the order in which the evidence may be introduced and the like, has wide bounds and will rarely be reviewed on appeal; never except when it clearly appears that in the use of that discretion, an injury has been done to one of the parties to the action.

Eleventh. Under exceptions Nos. 24, 30, 31, 32, the defendant objected to the testimony of the witnesses Peterson,

Candina, Morris, and Tuzo on the ground that their names had not been presented to the defendant in accordance with law.

These exceptions are presumably based on section 142 of the Code of Criminal Procedure, which reads as follows:

"Section 142.—The arraignment must be made by the prosecuting attorney, which consists in reading the information to the defendant and delivering to him a copy thereof, and of the indorsements thereon, including the list of witnesses, whereupon the court asks him whether he pleads guilty or not guilty to the information."

It was not the intention of this statute to prevent the prosecuting attorney from examining any witness whose name might not be endorsed on the information. A statute similar to ours exists in California, and was construed by the Supreme Court of that State in the following words:

"It was not error for the court to permit a witness to be sworn for the prosecution, because his name was not marked on the indictment. It often happens that the necessity for introducing particular witnesses arises on the trial; and justice would be greatly impeded if the rule invoked were affirmed, while no corresponding advantages would accrue from it." (*The People v. Bonney,* 19 Cal., 447.)

To the same effect are the decisions of the same eminent court in the following cases: *People* v. *Jocelyn,* 29 Cal., 562; *People* v. *López,* 26 Cal., 112; *People* v. *Symonds,* 22 Cal., 348; *People* v. *Freeland,* 6 Cal., 96.

The introduction of examinations of witnesses on a criminal trial are necessarily placed under the control of the trial court and in many instances the judge must use a sound judicial discretion in regulating the same. Unless his discretion has been so used as to prejudice the rights of the defendant or The People, and this is made to appear from the record, his rulings in such matters are not subject to revision (Law of 30th of May, 1904, special session, p. 10).

Twelfth. The witness Peterson having been asked if he

knew that Mr. Dix conferred the duties of treasurer on any other person, the defendant's objection, made upon the ground that the witness was incompetent upon that point, was overruled and the twenty-fifth exception taken thereto. No further reason is given for the objection to this testimony nor is any explanation made of why the witness should be deemed incompetent. Nor does the ruling of the court throw any further light upon the matter. The witness should certainly have been permitted to state whether or not he had any knowledge concerning any fact unless the fact itself was altogether impertinent to the issue on trial. There is nothing worthy of consideration in this exception.

Thirteenth. The twenty-sixth exception relates to a certain book about which the witness Peterson was examined, and which the defendant's counsel claimed the right to inspect.

Certainly the defendant's counsel had the right to inspect the book in question, or any other document offered by the prosecution, before it could be admitted in evidence. But the prosecuting attorney was properly permitted first to examine the witness upon it and the defendant's counsel could not claim the right of inspection until this examination was concluded and the witness passed to the defense for cross-examination. At such a stage of the proceedings defendant's counsel could demand an inspection of the book and time to examine it. This as appears from the record was the course which was substantially pursued by the trial court, and in this matter no error occurred.

Fourteenth. The twenty-seventh, twenty-eighth and twenty-ninth exceptions were made by defendant's counsel to a question propounded by the *fiscal* to the witness Harry, who was called by the prosecution. He was asked: "Did you testify before Mr. Rossy, the *fiscal* of this court?" A paper was presented to him purporting to be his testimony taken before the *fiscal,* and counsel claimed the right to inspect it. The objection was on the ground that the government could

not thus impeach its own witness. The court on the authority of sections 243 and 245 of the Code of Criminal Procedure overruled the objection. The sections cited plainly support the ruling of the court. If the object of the *fiscal* was to impeach the witness Harry, which is not shown by the record, he clearly had a right to do so by showing that he had at some other time made statements inconsistent with the testimony then given. If the document presented to the witness was signed by him, then he had the right to inspect it, under certain restrictions, for the purpose of refreshing his memory as to the facts stated. In either case the exception made by the defense should not prevail. This exception does not clearly present the objection made by defendant's counsel and it is very difficult to surmise the point which counsel desired to make. If exceptions taken on the trial are so obscurely worded that this court cannot understand the issue presented, the action of the trial court in regard to the matter must be sustained.

Fifteenth. The 33rd exception made by the defendant was to the overruling by the court of a motion made in his behalf to instruct the jury to render a verdict of acquittal for want of sufficient evidence to sustain a conviction, or to overcome the presumption of innocence. This involves a review of the whole evidence introduced by the prosecution up to the 13th of September, 1904, the date of the said motion. This will be considered in connection with the motion to direct a verdict of acquittal made later at the conclusion of the trial and set out in the thirty-eighth exception. From all that appears in the record, this motion was properly overruled. All the testimony taken on the trial was not contained in the record, there being no statement of facts, and the bill of exceptions only presenting detached portions of the evidence, and the court must, therefore, act on the presumption that there was sufficient evidence introduced to justify the action of the trial court in overruling defendant's motion, to instruct an acquittal.

Sixteenth. At the conclusion of the evidence by both parties the defendant, as appears by this the thirty-eighth exception, moved the court to direct a verdict of acquittal in his favor, on the ground that there was no evidence on which to base a verdict of conviction and no proof of the offense of which the defendant was accused. This brings the whole evidence before this court for review. But we are confronted with the condition of the record which does not include a statement of facts, and the bill of exceptions therein contained does not purport to set out all the evidence or a sufficient part of it to enable this court to properly consider either this proposition or the previous one which was presented under the thirty-third exception. This court cannot guess at the question. The whole proof must be presented to the appellate court in a matter of this kind involving as it does the sufficiency of the evidence produced on the trial to support the verdict of the jury and the judgment of the court. We have repeatedly decided that we cannot consider propositions involving the weight of evidence or the effect which it should have, unless the verbal testimony produced on the trial, or at least all of it which is pertinent to the point in issue, is brought before this court, on a bill of exceptions, or a statement of facts. This is in accordance with section 214 of the Code of Civil Procedure, to which reference is made. This has not been done in this case, hence the ruling on these motions cannot be reviewed nor held to be erroneous; but must stand as correctly made.

See cases decided by this court as follows: *People of P. R. v. Francisco Rivera,* decided 9th December, 1905, (9 P. R. Reps., p. 454); *People of Porto Rico v. Eligier and Groló,* decided 20th November, 1905 (Id., p. 357); *People of Porto Rico v. Brenes,* decided 18th December, 1905 (Id., p. 503); also the authorities cited in the opinions in these cases.

Seventeenth. The charge of the court was objected to in the thirty-ninth exception of the defendant; and special reference is made to that portion of the charge defining the crime

of *abuso de confianza* (embezzlement). The charge is found on pages 222 to 227, inclusive, of the record. It correctly defines the offense of embezzlement, which is translated by the Spanish term *abuso de confianza,* which literally means "abuse of confidence." Ambiguities will necessarily arise in translating legal terms from one language to another, but in this case the ambiguity is reduced to a minimum and the defendant has suffered no injury thereby. No specification is made of the grounds of defendant's objection to the charge and no further explanation given of the matter. Such an exception is too vague to merit attention or demand of an appellate court any extensive investigation. The charge taken as a whole is an able exposition of the law in regard to the case on trial. It was eminently clear and fair to the accused, as well as just to the Government. No well grounded exception, as far as our observation has extended, can be taken to it by the accused.

Eighteenth. The defendant, in the fortieth exception, objects to the verdict of the jury which read as follows:

"No. 822. *The People of Porto Rico* v. *J. E. Kent.* We, the members of the jury, find J. E. Kent, guilty of the crime of embezzlement with which he is charged. San Juan, P. R., 14 September, 1904.— Signed: Juan Apellániz, foreman."

Of this the defendant complains, for the following reasons stated in the words of his counsel, to wit:

"Which said verdict is bad in this, and cannot and ought not to sustain the commitment of the said defendant, on the ground that it is contrary to section 284 of the Code of Criminal Procedure in that the said crime being a crime which is distinguished into degrees as appears in article 455 of the Penal Code, while the said verdict does not so distinguish the said offense and by its terms could not and should not sustain a sentence for more than the lesser degree of said crime."

Section 284 of the Code of Criminal Procedure reads as follows:

"Whenever a crime is distinguished into degrees the jury, if they convict the defendant, must find the degree of the crime of which he is guilty."

We have heretofore held that this section must be complied with, in all verdicts rendered in crimes which are distinguished into degrees. (See the case of *Francisco Rivera*, decided on the 25th of June, 1904, 7 P. R. Rep., p. 325); Jur. Crim., p. 52 *et seq.*)

Let us see if embezzlement is such a crime. It is claimed that embezzlement is a species of larceny differing from it only in the circumstance that in the former crime the offender already has lawful possession of the property which he appropriated to his own use while in the latter the property is illegally taken from the possession of the owner or his agent. This principle is correct as far as it goes. But is it divided into degrees? What does the law say?

Section 455 of the Penal Code reads thus:

"Embezzlement is the fraudulent appropriation of property by a person to whom it has been intrusted."

The sections defining larceny are sections 426 *et seq.*, which read as follows:

"426.—Larceny is the felonious stealing, taking, carrying, leading or driving away the personal property of another.

"427.—Larceny is divided into two degrees, the first of which is termed grand larceny; the second, petit larceny.

"428.—Grand larceny is larceny committed in either of the following cases:

"1. When the property taken is of the value of $50 and upwards.

"2. When the property is taken from the person of another.

"3. When the property is a horse, mare, gelding, cow, steer, bull, calf, mule, jack, or jenny.

"429.—Larceny in other cases is petit larceny and is punishable accordingly.

"430.—Grand larceny is punishable by imprisonment in the penitentiary for not less than one nor more than ten years.

"431.—Petit larceny is punishable by fine not exceeding $500, or by imprisonment in jail not exceeding one year, or both."

By section 455 of the Penal Code it is enacted that every person guilty of embezzlement is punishable in the manner prescribed for feloniously stealing property of the value of that embezzled. Nothing is said in the Code about the division of this crime into degrees; and if it is to be considered as so distinguished, such a ruling must be based on the fact that the punishment is similar to that provided for larceny.

The *fiscal* of this court argues on this point as follows:

"The crime of embezzlement is really not a crime divided into degrees, but the punishment in case of conviction should be governed by the provisions of the Code for the appropriation of property, and as the information sets out the value of the property appropriated, therefore the crime charged is sufficiently well known. When the jury says: 'We consider J. E. Kent guilty of embezzlement, the crime of which he is charged,' that crime could be no other than the appropriation to his own benefit of the sum of $1,896.77, which is exactly the crime charged in the information."

Where the information is for grand larceny and the verdict returned finds the defendant "guilty as charged," this has been held to constitute a conviction of grand larceny. The verdict in such a case is not held amenable to the objection that it does not specify the degree as required in section 284 of the Code of Criminal Procedure. This latter section is identical with 1157 of the Penal Code of California and section 2145 of the Penal Code of Montana. Then, even conceding that embezzlement is a form of theft or larceny, the verdict under the California Decisions need not designate the sum embezzled with more particularity than to find the defendant "guilty as charged" when the sum embezzled is fixed in the information itself. This statement is in accordance with the California Decisions, which are as follows:

"The information is for grand larceny, and a verdict of 'guilty as

charged' is a conviction of grand larceny." (*People* v. *Whitely*, 64 Cal., 211; *People* v. *Price*, 67 Cal., 350; *People* v. *Pérez*, 87 Cal., 123.)

## In another case Chief Justice Morrison says:

"The defendant was charged by information, prosecuted, and convicted of the crime of grand larceny, the charge being that she feloniously took and carried away four $20 gold pieces, the same being the property of the prosecuting witness. On the trial, the court charged the jury that the form of the verdict should be, if they found the defendant guilty, as follows: 'We the jury, find the defendant guilty as charged.' The jury did find the defendant 'guilty as charged' and this presents the only point in the case on appeal.

"The question is not a new one in this court. In the case of *People* v. *Whitely*, 64 Cal., 211, this court sitting in banc, held such a verdict good, and affirmed the judgment. In the more recent case of *People* v. *Price*, 67 Cal., 350, the case of *People* v. *Whitely, supra*, was cited with approbation by the entire court. These cases leave the question no longer open in this court, and following the same, we must affirm the proceedings of the court below." (*People* v. *Manners*, 70 Cal., 428.)

## In another case the Supreme Court of California uses the following language:

"The other point is that the verdict is a nullity inasmuch as it does not conform to section 1157 of the Penal Code, which provides that 'whenever a crime is distinguished into degrees, the jury, if they convict the defendant, must find the degree of the crime of which he is guilty.'

"The only question in the case is whether the crime with which the defendant was charged and of which he was convicted is distinguished into degrees. If it is, the verdict of the jury is clearly imperfect and bad under the foregoing section of the Penal Code.

"By section 486 of the Penal Code 'larceny' is divided into two degrees, the first of which is termed 'grand larceny,' the second 'petit larceny,' and by section 487 grand larceny is committed in either of the following cases:

"1. When the property taken is of the value exceeding $50.

"2. When the property is taken from the person of another.

"3. When the property taken is a horse, mare, gelding, cow, steer, bull, calf, mule, jack or jenny.

"Section 488.—Larceny in other cases is petit larceny.

"In the case we are now considering the defendant was charged with the crime of grand larceny, inasmuch as he was accused of stealing money from the person of another.

"It will be observed that the defendant was charged in the information with the crime of grand larceny, and it was further charged that the stolen goods were taken from the person of another. Now, there is under the law but one degree of grand larceny, whether the property stolen is of the value of $50 or $50,000, and every larceny committed by taking from the person of another is in its degree grand larceny. So that in either aspect of the case the charge against the defendant was the crime of grand larceny, which as already remarked, is without degrees, and the verdict of the jury, finding the defendant guilty was 'guilty as charged,' that is to say, guilty of grand larceny.

"In the case of the *People* v. *Whitely*, 64 Cal., 211, in which the defendant was charged with the crime of grand larceny, the verdict was 'guilty as charged,' and it was held sufficient. In our opinion the same rule is justly applicable to the case now before us. There is nothing doubtful or uncertain in the verdict." (*People* v. *Price*, 67 Cal., 350.)

The verdict would probably be considered sufficient under section 283 of the Code of Criminal Procedure, which says: "A general verdict upon a plea of not guilty is either 'guilty' or 'not guilty,' which imports a conviction or an acquittal of the *offense charged in the information.*" As embezzlement is not itself divided into degrees or even into *grand* embezzlement and *petty* embezzlement, no reference need be made to section 284 of same Code.

We feel constrained to hold this verdict sufficient, in view of the construction put upon the section of the Code, to which reference has been made, by the Supreme Court of California, although the reasoning is not altogether clear or satisfactory to our minds. It has become an established canon of construction in the Supreme Court of the United States that where a statute is adopted from the Code of another State, it is presumed to have been taken with its meaning as judicially determined in the State from which it was adopted. See the

following authorities: *Henrietta Mining & Milling Co.* v. *Gardner,* 173 U. S., 130; *Brown* v. *Walker,* 161 U. S., 600; *McDonald* v. *Hovey,* 110 U. S., 628; *Cathcart* v. *Robinson,* 30 U. S., 279; *Pennock* v. *Dialogue,* 27 U. S., 16; Sedgwick on Cons. Stat. & Cons. Law, 363; Smith's Com. on Stat. & Cons. Law, 634.

Nineteenth. The sentence is also denounced as illegal by the forty-first exception taken by the defendant, but the ground of the objection is not stated. It may be on account of the term of punishment which was imposed upon the defendant. The punishment could have been fixed at any term in the penitentiary ranging from one to ten years. It was fixed at three years, which was within the limits. As the discretion is confined to the trial court to fix the term of imprisonment, unless an abuse of such discretion is shown in the record this court will not modify the sentence in this respect. See case of *People of Porto Rico* v. *Brenes,* decided on the 18th of December, 1905 (9 P. R. Rep., p. 503), at a former term of the court, and cases there cited. No such abuse is shown in this case and the term is not long in proportion to the offense.

Twentieth. Other matters than those set out in the bill of exceptions, and which do not properly belong to the case or the record have been injected into this trial, but they deserve no attention, and will receive none.

From the careful and repeated examination made of the entire record, and particularly of the questions raised in favor of the defendant, we are fully convinced that the trial of this case in the district court was fair and impartial, and that no material error has been committed there which could in any way prejudice the rights of the accused; and we therefore maintain the opinion that the judgment of the District Court should be affirmed.

*Affirmed.*

Chief Justice Quiñones and Justices Hernández, Figueras and Wolf concurred.